WYER (DAVIS v.). See Case No. 3,660.

## Case No. 18,107.

### WYETH et al. v. STONE et al.

[1 Story, 273; 4 Law Rep. 54; 2 Robb, Pat. Cas. 23; Merw. Pat. Inv. 85.] [1]

Circuit Court, D. Massachusetts. Oct. Term, 1840.

PATENTS FOR INVENTIONS—ICE CUTTING MACHINE—SURRENDER TO PUBLIC USE—EFFECT—SPECIFICATIONS—SEPARATE MACHINES — ASSIGNMENT OF PATENT.

1. In a bill in equity for a perpetual injunction of the defendants, on account of an asserted violation of a patent right for an invention, it is a good defence, that prior to the granting of the patent, the inventor had allowed the invention to go into public use, without objection. But it should be clearly established by proof, that such public use was with the knowledge and consent of the inventor. The mere user by the inventor of his invention, in trying experiments, or by his neighbours, with his consent, as an act of kindness for temporary and occasional purposes only, will not destroy his right to a patent therefor.

[Cited in Blackinton v. Douglass, Case No. 1,470; Jones v. Sewall, Id. 7,495.]

[Cited in brief in Schillinger v. Cranford, 4 Mackey, 456.]

2. If the defendants use a substantial part of the invention patented, although with some modifications of form or apparatus, it is a violation of the patent right. So, if the patent be of two machines, and each is a new invention, and the defendant use only one of the machines.

3. If the patentee, after obtaining his patent, dedicates or surrenders it to public use, or acquiesces for a long period in the public use thereof, without objection, he is not entitled to the aid of a court of equity to protect his patent; and such acquiescence may amount to complete

proof of a dedication or surrender thereof to the public.

[Cited in Taylor v. Carpenter, Case No. 13,-785; Bartlette v. Crittenden, Id. 1,082; Teese v. Phelps, Id. 13,819; Magic Ruffle Co. v. Elm City Co., Id. 8,950; Kelleher v. Darling. Id. 7,653; Johnson v. Onion, Id. 7,401; Hoffheins v. Brandt, Id. 6,575; Jones v. Sewall. Id. 7,495; McLean v. Fleming, 96 U. S. 245; Bates v. Coe, 98 U. S. 46; McLaughlin v. People's Ry. Co., 21 Fed. 575; Kittle v. Hall. 29 Fed. 511; Blair v. Lippincott Glass Co., 52 Fed. 227.]

4. But to entitle the defendants to the benefit of such a defence, the facts must be explicitly relied on, and put in issue by their answer; otherwise the court cannot notice it.

5. In the present case, the patent and specification claimed for the patentee, as his invention, the cutting of ice of a uniform size by means of an apparatus worked by any other power than human. It claimed, also, not only the invention of this art, but also the particular method of the application of the principle, stated in the specification, which was by two machines described therein, called the saw and the cutter. It was *held* by the court, that the specification, so far as it claimed the art of cutting ice by means of an apparatus worked by any other power than human, was the claim of an abstract principle, and void.

[Cited in Hovey v. Stevens. Case No. 6,746; Smith v. Downing, Id. 13,036; Rapid Service Store Ry. Co. v. Taylor. 43 Fed. 250.]

6. But so far as it claimed the two machines described in the specification, it might be good, if a disclaimer were made of the other parts, according to the patent act of 1837, c. 45, §§ 7, 9 [5 Stat. 193, 194], within a reasonable time, and before the suit were brought. But a disclaimer, after the suit brought, would not be sufficient to entitle the party to a perpetual injunction in equity, whatever might be his right to maintain a suit at law on the patent.

[Disapproved in Tuck v. Bramhill, Case No. 14,213. Cited in Sessions v. Romadka, 145 U. S. 29, 12 Sup. Ct. 802.]

[Cited in brief in Schillinger v. Cranford, 4 Mackey, 456.]

7. If the patentee has assigned his patent in part, and a joint suit is brought in equity for a perpetual injunction, a disclaimer by the patentee alone, without the assignee's uniting in it, will not entitle the parties to the benefit of the 7th and 9th sections of the act of 1837, c. 45.

[Cited in Louden v. Birt, 4 Ind. 568.]

8. A single patent may be taken for several improvements on one and the same machine, or for two machines, which are invented by the patentee, and conduce to the same common purpose and object, although they are each capable of a distinct use and application, without being united together. But a single patent cannot be taken for two distinct machines, not conducing to the same common purpose or object, but designed for totally different and independent objects.

[Cited in Pitts v. Whitman. Case No. 11,196; Emerson v. Hogg. Id. 4,440; s. c. 6 How. (47 U. S.) 483; Sessions v. Romadka, 21 Fed. 131.]

[Cited in Burke v. Partridge, 58 N. H. 352.]

9. An inventor is bound to describe in his specification, in what his invention consists, and what his particular claim is. But he is not bound to any precise form of words, provided their import can be clearly ascertained by fair interpretation, even though the expressions may be inaccurate.

[Cited in Davoll v. Brown. Case No. 3,662; Hovey v. Stevens. Id. 6,746; Smith v. Downing, Id. 13,036.]

[Cited in Burke v. Partridge, 58 N. H. 351.]

---

[1] [Reported by William W. Story, Esq. Merw. Pat. Inv. 85, contains only a partial report.]

10. The assignee of a patent right, in part or in whole, cannot maintain any suit at law, or in equity, either as sole or as joint plaintiff thereon, at least as against third persons, until his patent has been recorded in the proper department, according to the requisitions of the patent acts.

Bill in equity for a perpetual injunction, and for other relief, founded upon allegations of the violation, by the defendants, of a patent right, granted originally to the plaintiff [Nathaniel J.] Wyeth, as the inventor, by letters patent, dated the 18th of March, A. D. 1829, "for a new and useful improvement in the manner of cutting ice, together with the machinery and apparatus therefor," as set forth in the schedule to the letters patent; and afterwards with a small reservation assigned to the other plaintiff [Frederick] Tudor, on the 9th of February, 1832, by a deed of assignment of that date, but which had never been recorded. The schedule set forth two different apparatus or machines for cutting the ice, the one called the saw, the other the cutter, which are capable of being used separately or in combination, and described their structure, and the mode of applying them, as follows:

(1) Two bars of iron, or other material, secured to each other by cross bars: the two first mentioned to be of such distance apart as the dimension of the ice is required to be. (2) On each outside bar is bolted a plate of iron as long as the bar, and at right angles with the cross bars. These plates to be so bolted to the bars as to project three inches each on one side of the bars to which they are bolted, and one of them to project on the other side of the bar two inches; the other, one inch. These projections may be varied, according to the desired depth of the cut. (3) These plates, both on the upper side and on the under side of the bars, are to be cut at four equi-distant points each, at an angle of forty-five degrees, or thereabouts, to the bar, thereby forming a cutting point of forty-five degrees, or thereabouts; to this point is welded a piece of steel, to form the chisel. The rear end of the plates to be of the before specified width from the bar, but to diminish toward the front end one fourth of an inch at each point, thereby giving each succeeding point a clear cut of one fourth of an inch deeper than its precursor. (4) The mouths, by which the chips cut from the ice by the chisels are discharged, are made similar to that of a carpenter's plough. (5) To the middle of the front cross-bar is fixed a ring, for the purpose of attaching a draught chain, to which the horse that draws the cutter is to be harnessed. (6) This first part of the apparatus for cutting ice is called the cutter, and is used as follows: The cutter is laid on the ice, with the three-inch side of the plates downward, and drawn forward in a straight line as far as is required, thus making two grooves of an inch deep. The horse is then turned about, and the cutter turned over, so that the two-inch side of the

plate shall be in one of the first grooves cut, and the one-inch side on the ice; and as the cutter is drawn forward, the two-inch side makes one of the first grooves an inch deeper, and the one-inch side forms a new groove of an inch deep. Proceed in this manner until as many grooves are cut as are wanted; then turn the cutter over upon the three-inch side, go over the whole again with this side, and they are finished. Repeat the same process at right angles with the first grooves, and the operation with this part of the apparatus is finished.

Part Second of Apparatus for Cutting Ice. (1) Two spur-wheels, about three feet six inches, more or less, in diameter, connected together by an axletree of iron, or other material, from the centre of each to the other, fixed immovable in each. (2) A pair of fills, proceeding from the axletree, and secured to it by a pair of composition boxes, admitting the axletree to turn in them. (3) A cog wheel, about three feet two inches in diameter, more or less, fixed in the centre of the axletree, so as to be incapable of turning, except with the axletree. (4) A pair of handles attached to the axletree, in the same manner as the fills, so as to admit of the motion of the axletree in them; these handles to be placed one on each side of the cog wheel in the centre of the axletree, and to be connected together by a permanent bar, at a suitable distance from the axletree. (5) Two cog wheels, about four inches diameter, more or less, one of which to work on the large cog wheel, and the other to work on the one so working, and both to be secured by pintles passing through the handles: the small cog wheel not working on the large cog wheel to have secured beside it a circular saw, about two and a half feet diameter, more or less. (6) The proportion between the large and small cog wheels is varied, to obtain greater or less velocity for the saw, as may be wanted. This part of the apparatus for cutting ice is called the saw, and is used as follows: Put the saw into one of the outside grooves made by the cutter; drive the horse forward, following the groove made by the cutter; at the same time a man who manages the handles presses them down as much as the strength of the horse will admit of. This operation is followed back and forth, until the ice is cut through. The same is done with the outer parallel groove on the opposite side of the work, and also on one of the end grooves, running at right angles with these. By this process the ice on the three sides of the plat; or work marked by the cutter, is cut through, When this is done, take an iron bar (one end of which is wide and fitted to the groove, and the other end of which is sharpened as a chisel,) and insert the end which is fitted to the groove into the groove next to and parallel with the end groove which is cut through; pry lightly in several places, then more strongly, until the ice is broken off; then

strike lightly with the chisel end of the bar into the cross grooves of the piece split off, and it easily separates into square pieces. Thus proceed with the whole plat marked out by the cutter. It is claimed as new, to cut ice of a uniform size, by means of an apparatus worked by any other power than human. The invention of this art, as well as of the particular method of the application of the principle, is claimed by the subscriber.

The answer insisted upon various grounds of defence, which are fully stated in the argument and in the opinion of the court.

W. H. Gardiner, for plaintiffs, contended: That the right acquired by the patent had not been lost by any act of the plaintiffs, the evidence not disclosing any abandonment, or dedication to the public. Pennock v. Dialogue, 2 Pet. [27 U. S.] 16; Shaw v. Cooper, 7 Pet. [32 U. S.] 292; Mellus v. Silsbee [Case No. 9,404]; Goodyear v. Mathews [Id. 5,576]; Phil. Pat. 184, 186. That the specification was sufficient on its face; and if not, that the fault was cured by the disclaimer. Ames v. Howard [Case No. 326]; Phil. Pat. 93; Whittemore v. Cutter [Case No. 17,600]; Lowell v. Lewis [Id. 8,568]. That superfluous matter in the specification did not vitiate it. Lewis v. Marling, 1 Lloyd & W. 28; Moody v. Fiske [Case No. 9,745]; Phil. Pat. 286. And that the several matters were well embraced in it; Evans v. Eaton, 3 Wheat. [16 U. S.] 454; Stearns v. Barrett, 1 Pick. 448; Barrett v. Hall [Case No. 1,047]; Phil. Pat. 216, 219, 229, 246, 274.

S. Greenleaf and G. T. Bigelow, for defendants, contended: That the invention was not new and original, being merely the common carpenter's plough. That the specification was bad, as it contained not only more than the plaintiff, Wyeth, invented, but also, as it included two distinct machines, and a combination of different machines. Barrett v. Hall [supra]; Moody v. Fiske [Case No. 9,745]; Evans v. Eaton, 3 Wheat. [16 U. S.] 454, 506; 4 Barn. & Ald. 540; Whittemore v. Cutter [supra]; Cochrane v. Smethurst, 1 Starkie, 205; Phil. Pat. 102, 104, 275. That if it could be upheld at all, it was only for cutting two grooves by one operation, which the defendants had not invaded. That the case was not within the relief of the patent act of 1837, §§ 7, 9. That the invention had been published previous to the issuing of the patent. Phil. Pat. 184. And that after the patent was issued, the plaintiffs abandoned the use to the public, and thereby betrayed the defendants into the use of the machine; which, in equity, was a good bar to the claim of damages, and entitled the defendants to costs. Walcot v. Walker, 7 Ves. 1; Platt v. Button, 19 Ves. 447.

STORY, Circuit Justice. I have considered this cause upon the various points, suggested at the argument by the counsel on both sides, with as much care as I could, in the short time, which I have been able to command, since it was argued; and I will now state the results, with as much brevity, as the importance of the cause will permit.

The first point is, whether the invention claimed by the patentee is new, that is, substantially new. The patent is dated on the 18th of March, 1829, and is for "a new and useful improvement in the manner of cutting ice, together with the machinery and apparatus therefor." Assuming the patent to be for the machinery described in the specification, and the description of the invention in the specification to be, in point of law, certain and correctly summed up, (points, which will be hereafter considered,) I am of opinion, that the invention is substantially new. No such machinery is, in my judgment, established, by the evidence, to have been known or used before. The argument is, that the principal machine, described as the cutter, is well known, and has been often used before for other purposes, and that this is but an application of an old invention to a new purpose; and it is not, therefore, patentable. It is said, that it is in substance identical with the common carpenter's plough. I do not think so. In the common carpenter's plough there is no series of chisels fixed in one plane, and the guide is below the level, and the plough is a movable chisel. In the present machine, there are a series of chisels, and they are all fixed. The successive chisels are each below the other, and this is essential to their operation. Such a combination is not shown ever to have been known or used before. It is not, therefore, a new use or application of an old machine. This opinion does not rest upon my own skill and comparison of the machine with the carpenter's plough; but it is fortified and sustained by the testimony of witnesses of great skill, experience, and knowledge in this department of science, viz., by Mr. Treadwell, Mr. Darracott, and Mr. Borden, who all speak most positively and conclusively on the point.

The next point is, whether the ice machine used by the defendants is an infringement of the patent; or, in other words, does it incorporate in its structure and operation the substance of Wyeth's invention? I am of opinion, that it does include the substance of Wyeth's invention of the ice cutter. It is substantially, in its mode of operation, the same as Wyeth's machine; and it copies his entire cutter. The only important difference seems to be, that Wyeth's machine has a double series of cutters, on parallel planes; and the machine of the defendants has a single series of chisels in one plane. Both machines have a succession of chisels, each of which is progressively below the other, with a proper guide placed at such distance, as the party may choose to regulate the move-

ment; and in this succession of chisels, one below the other, on one plate or frame, consists the substance of Wyeth's invention. The guide in Wyeth's machine is the duplicate of his chisel plate or frame; the guide in the defendants' machine is simply a smooth iron, on a level with the cutting single chisel frame or plate. Each performs the same service, substantially in the same way.

In the next place, as to the supposed public use of Wyeth's machine before his application for a patent. To defeat his right to a patent, under such circumstances, it is essential, that there should have been a public use of his machine, substantially as it was patented, with his consent. If it was merely used occasionally by himself in trying experiments, or if he allowed only a temporary use thereof by a few persons, as an act of personal accommodation or neighbourly kindness, for a short and limited period, that would not take away his right to a patent. To produce such an effect, the public use must be either generally allowed or acquiesced in, or at least be unlimited in time, or extent, or object. On the other hand, if the user were without Wyeth's consent, and adverse to his patent, it was a clear violation of his rights, and could not deprive him of his patent.

Now, I gather from the evidence (which, however, is somewhat indeterminate on this point) that Wyeth's machine, as originally invented by him, was not exactly like that, for which he afterwards procured the patent. On the contrary, he seems to have made alterations and improvements therein. Pratt (the witness) says, that he made the iron part of the first machine of Wyeth, which was partly of wood and partly of iron, in December, 1825, or in January, 1826; and that he afterwards, in December, 1827, made the machine, which was patented for Wyeth; and it was not patented until March, 1829. So that the latter seems to have been more perfect than the former. But, at all events, I cannot but think, that the evidence of the user, as a public user, of the invention before the patent was granted, is far too loose and general to found any just conclusion, that Wyeth meant to dedicate it to the public, or had abandoned it to the public before the patent. It appears to me, that the circumstances ought to be very clear and cogent, before the court would be justified in adopting any conclusion so subversive of private rights, when the party has subsequently taken out a patent.

In the next place, as to Wyeth's supposed abandonment of his invention to the public, since he obtained his patent. I agree, that it is quite competent for a patentee at any time, by overt acts or by express dedication, to abandon or surrender to the public, for their use, all the rights secured by his patent, if such is his pleasure, clearly and deliberately expressed. So, if for a series of years the patentee acquiesces without objection in the known public use by others of his invention, or stands by and encourages such use, such conduct will afford a very strong presumption of such an actual abandonment or surrender. A fortiori, the doctrine will apply to a case, where the patentee has openly encouraged or silently acquiesced in such use by the very defendants, whom he afterwards seeks to prohibit by injunction from any further use; for, in this way, he may not only mislead them into expenses, or acts, or contracts, against which they might otherwise have guarded themselves; but his conduct operates as a surprise, if not as a fraud upon them. At all events, if such a defence were not a complete defence at law, in a suit for any infringement of the patent, it would certainly furnish a clear and satisfactory ground, why a court of equity should not interfere either to grant an injunction, or to protect the patentee, or to give any other relief. This doctrine is fully recognized in Rundell v. Murray, Jac. 311, 316, and Saunders v. Smith, 3 Mylne & C. 711, 728, 730, 735. But if there were no authority on the point, I should not have the slightest difficulty in asserting the doctrine, as found in the very nature and character of the jurisdiction exercised by courts of equity on this and other analogous subjects.

There is certainly very strong evidence in the present case, affirmative of such an abandonment or surrender, or at least of a deliberate acquiescence by the patentee in the public use of his invention by some or all of the defendants, without objection, for several years. The patent was obtained in 1829; and no objection was made, and no suit was brought against the defendants for any infringement until 1839, although their use of the invention was, during a very considerable portion of the intermediate period, notorious and constant, and brought home directly to the knowledge of the patentee. Upon this point, I need hardly do more than to refer to the testimony of Stedman and Barker, who assert such knowledge and acquiescence for a long period, on the part of the patentee, in the use of these ice cutters by different persons (and among others by the defendants), on Fresh Pond, where the patentee himself cut his own ice. It is no just answer to the facts so stated, that until 1839, the business of Wyeth, or rather of his assignee, the plaintiff, Tudor, was altogether limited to shipments in the foreign ice trade, and that the defendants' business, being confined to the domestic ice trade, did not interfere practically with his interest under the patent. The violation of the patent was the same, and the acquiescence the same, when the ice was cut by Wyeth's invention, whether the ice was afterwards sold abroad, or sold at home. Nor does it appear, that the defendants have as yet engaged at all in the foreign ice trade. It is the acquiescence in the known user by the public without objection or qualification, and not the extent

of the actual user, which constitutes the ground, upon which courts of equity refuse an injunction in cases of this sort. The acquiescence in the public use, for the domestic trade, of the plaintiff's invention for cutting ice, admits, that the plaintiff no longer claims or insists upon an exclusive right in the domestic trade under the patent; and then he has no right to ask a court of equity to restrain the public from extending the use to foreign trade, or for foreign purposes. If he means to surrender his exclusive right in a qualified manner, or for a qualified trade, he should at the very time give public notice of the nature and extent of his allowance of the public use, so that all persons may be put upon their guard, and not expose themselves to losses or perils, which they have no means of knowing or averting during his general silence and acquiescence.

The cases, which have been already cited, fully establish the doctrine, that courts of equity constantly refuse injunctions, even where the legal right and title of the party are acknowledged, when his own conduct has led to the very act or application of the defendants, of which he complains, and for which he seeks redress. And this doctrine is applied, not only to the case of the particular conduct of the party towards the persons, with whom the controversy now exists, but also to cases, where his conduct with others may influence the court in the exercise of its equitable jurisdiction. Rundell v. Murray, Jac. 311, 316; Saunders v. Smith, 3 Mylne & C. 711, 728, 730, 735. Under such circumstances, the court will leave the party to assert his rights, and to get what redress he may at law, without giving him any extraordinary aid or assistance of its own.

But the difficulty in the present case arises, not so much from the doctrine considered in itself, as from the utter impracticability of applying it on account of the state of the pleadings. The point is not raised, or even suggested in the answer, in any manner whatsoever, as a matter of defence; and, of course, it is not in issue between the parties; and the whole evidence, taken on the point, is irrelevant and cannot be looked to, as a matter in judgment. This defect in the pleadings, therefore, puts the question entirely beyond the reach of the court.

In the next place, as to the objections taken to the specification. The question here necessarily arises, for what is the patent granted? Is it for the combination of the two machines described in the specification (the cutter and the saw) to cut ice? Or for the two machines separately? Or for the two machines, as well separately, as in combination? Or for any mode whatsoever of cutting ice by means of an apparatus, worked by power, not human, in the abstract, whatever it may be? If it be the latter, it is plain, that the patent is void, as it is for an abstract principle, and broader than the

invention, which is only cutting ice by one particular mode, or by a particular apparatus or machinery. In order to ascertain the true construction of the specification in this respect, we must look to the summing up of the invention, and the claim therefor, asserted in the specification; for it is the duty of the patentee to sum up his invention in clear and determinate terms; and his summing up is conclusive upon his right and title. This was the doctrine maintained in Moody v. Fiske [Case No. 9,745]; (see, also, Hill v. Thompson, 8 Taunt. 375); and I see no reason to doubt it, or to depart from it.

Now, what is the language, in which the patentee has summed up his claim and invention? The specification states: "It is claimed, as new, to cut ice of a uniform size, by means of an apparatus worked by any other power than human. The invention of this art, as well as the particular method of the application of the principle, are claimed by the subscriber" (Wyeth). It is plain, then, that here the patentee claims an exclusive title to the art of cutting ice by means of any power, other than human power. Such a claim is utterly unmaintainable in point of law. It is a claim for an art or principle in the abstract, and not for any particular method or machinery, by which ice is to be cut. No man can have a right to cut ice by all means or methods, or by all or any sort of apparatus, although he is not the inventor of any or all of such means, methods, or apparatus. A claim broader than the actual invention of the patentee is, for that very reason, upon the principles of the common law, utterly void, and the patent is a nullity. Moody v. Fiske [supra]; Brunton v. Hawkes, 4 Barn. & Ald. 541; Hill v. Thompson, 8 Taunt. 375, 399, 400; Evans v. Eaton, 7 Wheat. [20 U. S.] 356; Phil. Pat. pp. 268–282, c. 11, § 7. Unless, then, the case is saved by the provisions of the patent act of 1836, c. 357 [5 Stat. 117], or of the act of 1837, c. 45 [Id. 191], which will hereafter be considered, the present suit cannot be sustained.

But, besides this general claim, there is another claim in the specification for the particular apparatus and machinery to cut ice, described in the specification. The language of the specification here is: "The invention of this art," (the general claim already considered,) "as well as the particular method of the application of the principle," (omitting the words of reference, as above described,) "are claimed by the subscriber." Now, assuming the former objection, that the claim for a general or abstract principle is not a fatal objection in the present case, it has been argued that the specification is too ambiguous to be maintainable in point of law; for it does not assert, what is claimed as the patentee's invention; whether it be the two machines separately and distinctly, as several inventions, or the combination of them, or both the one and the other.

It appears to me, that the language of the

summary may be, and indeed ought to be construed, ut res magis valeat, quam pereat, to mean by the words "the particular method of the application," the particular apparatus and machinery described in the specification to effect the purpose of cutting ice. I agree, that the patentee is bound to describe, with reasonable certainty, in what his invention consists, and what his particular claim is. But it does not seem to me, that he is to be bound down to any precise form of words; and that it is sufficient, if the court can clearly ascertain, by fair interpretation, what he intends to claim, and what his language truly imports, even though the expressions are inaccurately or imperfectly drawn.

Is the patent, then, a patent for the combination of the two machines, viz.: the saw and the cutter? If it be, then the defendants clearly have not violated the patent right; for they use the cutter only; and the saw-machine has been abandoned in practice by the patentee himself, as useless, or unnecessary. It appears to me, that the patent is not for the combination of the machines, but for each machine separately and distinctly, as adapted to further and produce the same general result, and capable of a separate and independent use. In short, the one may be auxiliary, but is not indispensable to the use of the other. I deduce this conclusion from the descriptive words of the specification, which show, that each machine is independent of the other in its operations, and from the silence of the patentee as to any claim for a combination. Tnis claim, then, for "the particular method of the application of the principle," although inartificial, may be reasonably interpreted, as used distributively, and as expressive of a distinct claim of each particular method set forth in the specification. I deem the patent, then, to be a claim for each distinct machine, as a separate invention, but conducing to the same common end. Of course, if either machine is new, and is the invention of Wyeth, and it has been actually pirated by the defendants, the plaintiff is entitled to maintain a suit therefor, under the acts of 1836 and 1837, although not at the common law. A fortiori, the same doctrine will apply, if both machines are new, upon the principles of the common law.

But it has been said, that if each of the machines patented is independent of the other, then separate patents should have been taken out for each; and that they cannot both be joined in one and the same patent; and so there is a fatal defect in the plaintiff's title. And for this position the doctrine stated in Barrett v. Hall [Case No. 1,047], and Evans v. Eaton, 3 Wheat [16 U. S.] 454, 506 (see, also, Phil. Pat. pp. 214–216), is relied on. I agree, that under the general patent acts, if two machines are patented, which are wholly independent of each other, and distinct inventions, for unconnect-

ed objects, then the objection will lie in its full force, and be fatal. The same rule would apply to a patent for several distinct improvements upon different machines, having no common object or connected operation. For, if different inventions might be joined in the same patent for entirely different purposes and objects, the patentee would be at liberty to join as many, as he might choose, at his own mere pleasure, in one patent, which seems to be inconsistent with the language of the patent acts, which speak of the thing patented, and not of the things patented, and of a patent for an invention, and not of a patent for inventions; and they direct a specific sum to be paid for each patent. Besides; there would arise great difficulty in applying the doctrines of the common law to such cases. Suppose one or more of the supposed inventions was not new, would the patent at the common law be void in toto, or only as to that invention, and good for the rest? Take the case of a patent for ten different machines, each applicable to an entirely different object, one to saw wood, another to spin cotton, another to print goods, another to make paper, and so on; if any one of these machines were not the invention of the patentee, or were in public use, or were dedicated to the public, before the patent was granted, upon the doctrines of the common law the patent would be broader than the invention, and then the consideration therefor would fail, and the patent be void for the whole. But if such distinct inventions could be lawfully united in one patent, the doctrine would lead to consequences most perilous and injurious to the patentee; for, if any one of them were known before, or the patent as to one was void, by innocent mistake or by priority of invention, that would take away from him the title to all the others, which were unquestionably his own exclusive inventions. On the other hand, if the doctrine were relaxed, great inconvenience and even confusion might arise to the public, not only from the difficulty of distinguishing between the different inventions stated in the patent and specification, but also of guarding themselves against fraud and imposition by the patentee, including doubtful claims under cover of others, which were entirely well founded. In construing statutes upon such a subject, these considerations are entitled to no small weight. At least, they show, that there is no ground, founded in public policy, or in private right, which calls for any expanded meaning of the very words of the statute; and that to construe them literally is to construe them wisely. It is plain, also, that the act of 1837, c. 45, in the ninth section, contemplated the rule of the common law as being then in full force; and, therefore, it seeks to mitigate it, and provides, "that whenever, by mistake, accident, or inadvertence, and without any intent to defraud or mislead the public, any patentee shall have,

in his specification, claimed to be the original and first inventor or discoverer of any material or substantial part of the thing invented" (not of different things invented) "of which he was not the first and original inventor, and shall have no legal or just right to claim the same, in every such case the patent shall be good and valid for so much of the invention or discovery" (not inventions or discoveries) "as shall be truly and bona fide his own; provided it shall be a material and substantial part of the thing patented, and be definitely distinguishable from the other parts, so claimed without right as aforesaid." This language manifestly points throughout to a definite and single invention, as the "thing patented," and does not even suppose, that one patent could lawfully include divers distinct and independent inventions, having no common connexion with each other, nor any common purpose. It may, therefore, fairly be deemed a legislative recognition and adoption of the general rule of law in cases, not within the exceptive provision of the act of 1837. And this is what I understand to have been intended by the court in the language used in Barrett v. Hall [supra]. It was there said, that "a patent under the general patent act cannot embrace various distinct improvements and inventions; but in such a case the party must take out separate patents. If the patentee has invented certain improved machines, which are capable of a distinct operation, and has also invented a combination of these machines to produce a connected result, the same patent cannot at once be for the combination, and for each of the improved machines; for the inventions are as distinct, as if the subjects were entirely different." And again: "If the patent could be construed as a patent for each of the machines severally, as well as for the combination, then it would be void, because two separate inventions cannot be patented in one patent." It is obvious, construing this language with reference to the case actually before the court, that the court were treating of a case, where each of the patented machines might singly have a distinct and appropriate use and purpose, unconnected with any common purpose, and therefore each was a different invention. In Moody v. Fiske [Case No. 9,745], the judge alluded still more closely to the distinction, and said: "I wish it to be understood, in this opinion, that though several distinct improvements in one machine may be united in one patent; (yet) it does not follow, that several improvements in two different machines, having distinct and independent operations, can be so included; much less, that the same patent may be for a combination of different machines, and for distinct improvements in each." It is perhaps impossible to use any general language in cases of this sort, standing almost upon the metaphysics of the law,

without some danger of its being found susceptible of an interpretation beyond that, which was then in the mind of the court. The case intended to be put in each of these cases was of two different machines, each applicable to a distinct object and purpose, and not connected together for any common object or purpose. And, understood in this way, it seems to me, that no reasonable objection lies against the doctrine.

Construing, then, the present patent to be a patent for each machine, as a distinct and independent invention, but for the same common purpose and auxiliary to the same common end, I do not perceive any just foundation for the objection made to it. If one patent may be taken for different and distinct improvements made in a single machine, which cannot well be doubted or denied, (see Moody v. Fiske [supra]), how is that case distinguishable in principle from the present? Here, there are two machines, each of which is or may be justly auxiliary to produce the same general result, and each is applied to the same common purpose. Why then may not each be deemed a part or improvement of the same invention? Suppose, the patentee had invented two distinct and different machines, each of which would accomplish the same end, why may he not unite both in one patent, and say, I deem each equally useful and equally new, but, under certain circumstances, the one may, in a given case, be preferable to the other? There is a clause in the patent acts, which requires, that the inventor, in his specification or description of his invention, should "fully explain the principle and the several modes, in which he has contemplated the application of that principle or character, by which it may be distinguished from other inventions." Now, this would seem clearly to show, that he might lawfully unite in one patent all the modes, in which he contemplated the application of his invention, and all the different sorts of machinery, or modifications of machinery, by which or to which it might be applied; and if each were new, there would seem to be no just ground of objection to his patent, reaching them all. Act 1793, c. 55, § 3 [1 Stat. 321]; Act 1836, c. 357. A fortiori, this rule would seem to be applicable, where each of the machines is but an improvement or invention conducing to the accomplishment of one and the same general end.

But let us take the case in another view, (of which it is certainly susceptible,) and consider the patent as a patent, not for each machine separately, but for them conjointly, or in the aggregate, as conducing to the same common end; if each machine is new, why may they not both be united in one patent, as distinct improvements? I profess not to see any good reason to the contrary. If they may be so united, and were both new, then, upon the principles established in Moody v.

Fiske, it is not necessary, in order to maintain a suit, that there should be a violation of the patent throughout. It is sufficient, if any one of the invented machines or improvements is wrongfully used; for that, pro tanto, violates the patent. In this view, therefore, the use of the cutter of the inventor, without any use of the saw, would be a sufficient ground to support the present bill, if it were not otherwise open to objection.

We come, then, to the remaining point, whether, although under the patent act of 1793, c. 55, the patent is absolutely void, because the claim includes an abstract principle, and is broader than the invention; or, whether that objection is cured by the disclaimer made by the patentee (Wyeth), under the act of 1837, c. 45. The seventh section of that act provides: "That whenever any patentee shall have, through inadvertence, accident, or mistake, made his specification too broad, claiming more than that, of which he was the original or first inventor, some material and substantial part of the thing patented being truly or justly his own, any such patentee, his administrators, executors, or assigns, whether of the whole or a sectional part thereof, may make disclaimer of such parts of the thing patented, as the disclaimant shall not claim to hold by virtue of the patent or assignment, &c., &c. And such disclaimer shall be thereafter taken and considered as a part of the original specification, to the extent of the interest, which shall be possessed in the patent or right secured thereby by the disclaimant, &c." Then follows a proviso, that "no such disclaimer shall affect any action pending at the time of its being filed, except so far as may relate to the question of unreasonable neglect or delay in filing the same." The ninth section provides, "That whenever, by mistake, accident, or inadvertence, and without any wilful default or intent to defraud or mislead the public, any patentee shall have, in his specification, claimed to be the first and original inventor or discoverer of any material or substantial part of the thing patented, of which he was not the first and original inventor, and shall have no legal or just right to claim the same, in every such case the patent shall be deemed good and valid for so much of the invention or discovery, as shall be truly and bona fide his own; provided it shall be a material and substantial part of the thing patented, and shall be definitely distinguishable from the other parts so claimed without right as aforesaid." Then follows a clause, that in every such case, if the plaintiff recovers in any suit, he shall not be entitled to costs, "unless he shall have entered at the patent office, prior to the commencement of the suit, a disclaimer of all that part of the thing patented, which was so claimed without right; with a proviso, "That no person bringing any such suit shall be entitled to the benefits of the provi-

sions contained in this section, who shall have unreasonably neglected or delayed to enter at the patent office a disclaimer as aforesaid."

Now, it seems to me, that upon the true construction of this statute, the disclaimer mentioned in the seventh section must be interpreted to apply solely to suits pending, when the disclaimer is filed in the patent office; and the disclaimer mentioned in the ninth section to apply solely to suits brought after the disclaimer is so filed. In this way, the provisions harmonize with each other; upon any other construction they would seem, to some extent, to clash with each other, so far as the legal effect and operation of the disclaimer is concerned.

In the present case, the suit was brought on the first of January, 1840, and the disclaimer was not filed until the twenty-fourth of October, of the same year. The proviso, then, of the seventh section would seem to prevent the disclaimer from affecting the present suit in any manner whatsoever. The disclaimer, for another reason, is also utterly without effect in the present case; for it is not a joint disclaimer by the patentee and his assignee, Tudor, who are both plaintiffs in this suit; but by Wyeth alone. The disclaimer cannot, therefore, operate in favor of Tudor, without his having joined in it, in any suit, either at law, or in equity. The case, then, must stand upon the other clauses of the ninth section, independent of the disclaimer.

This leads me to say, that I cannot but consider, that the claim made in the patent for the abstract principle or art of cutting ice by means of an apparatus worked by any other power than human, is a claim founded in inadvertence and mistake of the law, and without any wilful default or intent to defraud or mislead the public, within the proviso of the ninth section. That section, it appears to me, was intended to cover inadvertences and mistakes of the law, as well as inadvertences and mistakes of fact; and, therefore, without any disclaimer, the plaintiffs might avail themselves of this part of the section to the extent of maintaining the present suit for the other parts of the invention claimed, that is, for the saw and for the cutter, and thereby protect themselves against any violation of their rights, unless there has been an unreasonable neglect or delay to file the disclaimer in the office. Still, however, it does not seem to me, that a court of equity ought to interfere to grant a perpetual injunction in a case of this sort, whatever might be the right and remedy at law, unless a disclaimer has been in fact filed at the patent office before the suit is brought. The granting of such an injunction is a matter resting in the sound discretion of the court; and if the court should grant a perpetual injunction before any disclaimer is filed, it may be, that the patentee may never

afterwards, within a reasonable time, file any disclaimer, although the act certainly contemplates the neglect or delay to do so to be a good defence both at law and in equity, in every suit, brought upon the patent, to secure the rights granted thereby. However, it is not indispensable in this case to dispose of this point, or of the question of unreasonable neglect or delay, as there is another objection, which in my judgment is fatal, in every view, to the maintenance of the suit in its present form.

The objection, which I deem fatal, is, that the bill states and admits, that the assignment to the plaintiff, Tudor (made in February, 1832), has never yet been recorded in the state department, according to the provisions of the patent act of 1793, c. 55, § 4. That act provides, "That it shall be lawful for any inventor, his executor or administrator, to assign the title and interest in the said invention at any time; and the assignee, having recorded the said assignment in the office of the secretary of state, shall thereafter stand in the place of the original inventor, both as to right and responsibility." It seems a necessary, or, at least, a just inference, from this language, that until the assignee has so recorded the assignment, he is not substituted to the right and responsibility of the patentee, so as to maintain any suit at law, or in equity, founded thereon. It is true, that no objection is taken in the pleadings on account of this defect; but it is spread upon the face of the bill, and therefore the court is bound to take notice of it. It is not the case of a title defectively set forth, but of a title defective in itself, and brought before the court with a fatal infirmity, acknowledged to be attached to it. As between the plaintiffs and the defendants, standing upon adverse titles and rights, (whatever might be the case between privies in title and right,) Tudor has shown no joint interest sufficient to maintain the present bill; and therefore it must be dismissed, with costs.