## WESTERN WELL WORKS, Inc., et. al. v. LAYNE & BOWLER CORPO- RATION.

(Circuit Court of Appeals, Ninth Circuit. October 17, 1921. Rehearing Denied January 16, 1922.)

No. 3627.

**1. Patents ⬤⇒246—One element of combination patent may be infringed.**
   Suit may be maintained for infringement by the use of one part of a patented machine, where it constitutes an independent invention and is claimed as such.

**2. Patents ⬤⇒165—Patentee limited by claims.**
   A patent is no broader than its claims, and, if the language of a claim is clear and distinct, the patentee is bound by it.

**3. Patents ⬤⇒328—821,653, for well mechanism, claims 9, 13, and 20, held valid, but not infringed.**
   The Layne patent, No. 821,653, for well mechanism comprising a pump and apparatus for drawing water from driven or artesian wells, claims 9, 13, and 20, held valid, but not infringed by the apparatus of the Halstead patent, No. 1,228,770, or by the modified apparatus used by defendants.

**4. Patents ⬤⇒112(3)—Later patent presumed for different invention from that of earlier patent.**
   The issuance of a later patent raises a presumption that the invention claimed is different from that of an earlier patent, and the burden of proof rests upon a complainant to establish infringement.

   Gilbert, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the Southern Division of the Northern District of California, Second Division; Frank S. Dietrich, Judge.

Suit in equity by the Layne & Bowler Corporation against the Western Well Works, Inc., and others. Decree for complainant, and defendants appeal. Reversed.

This suit was brought for infringement of claims 9, 13, and 20 of letters patent No. 821,653, issued May 29, 1906, on an application filed April 28, 1903, to Mahlon E. Layne for "well mechanism"; the plaintiff and appellee being the assignee of said Layne.

Chas. E. Townsend and Wm. A. Loftus, both of San Francisco, Cal., for appellants.

Frederick S. Lyon, of Los Angeles, Cal., William K. White, of San Francisco, Cal., and Leonard S. Lyon, of Los Angeles, Cal., for appellee.

Raymond Ives Blakeslee, of Los Angeles, Cal., and Charles C. Montgomery, of Los Angeles, Cal., as amici curiæ.

Before GILBERT and MORROW, Circuit Judges, and WOLVERTON, District Judge.

MORROW, Circuit Judge. This is an appeal by the defendants from the interlocutory decree of the District Court of the United States for the Northern District of California, Second Division, entered De-

cember 31, 1920. The validity of patent No. 821,653 for "well mechanism," and the infringement of claims 9, 13, and 20, were in issue. The decree sustains the validity of the claims and holds that the defendants had infringed said claims, and directs a permanent injunction to issue against the defendants, enjoining and restraining them from making, using, selling, or causing to be made, used, or sold, any well mechanism embodying or containing the invention described in said letters patent and claimed in and by said claims 9, 13, and 20.

In the application for the patent in suit, Layne declared that he had "invented certain new and useful improvements in well mechanism," and he specifies that his "invention relates to the apparatus used for drawing water from driven or artesian wells, and particularly to the means for adjusting a pump therein."

The objects of the invention, he declares, are:

"To provide means by which the piping and the pump may be all assembled in proper shape before inserting it into the well; to provide means by which a pump may be placed in any desired position in a well, centered, raised, or lowered and fixed in position by manipulating from the outside entirely; to provide means for adjusting the length of the piping leading from the pump to the surface at will and to lower the pump from time to time without taking it out of the well; to provide improved means for centering and fixing the pump in proper position in the well casing; to provide improved means for manipulating the packing of the pump shaft, and proper adjustment of the pump in place by means at the surface of the ground; to provide for the proper action of a pump without stopping up the well, so that the water may be either flowed into or pumped out of the same at pleasure; to provide a superior mounting for a centrifugal pump in the well, manipulated from the surface of the ground; to provide an extensible pump shaft separately supported at intervals along its length; to provide an automatic centering device for the pump in the well; to provide for mounting the pump and the shaft in a closed casing which is open to operate from the top; to obviate the necessity of making large wells for descending into them in order to arrange the pump, and to generally improve and cheapen the apparatus used for the above purposes."

[1] The specification informs the public of the objects to be accomplished by the improvements in the well mechanism invented by the applicant, and for the purpose of claiming all his improvements in the mechanism as inventions he makes 22 claims. Six of these claims, namely, those numbered 1, 2, 8, 11, 16, and 19, assemble certain specified elements in each claim as forming in such claim a unit of invention in the mechanism. The remaining claims, namely, 3, 4, 5, 6, 7, 9, 10, 12, 13, 14, 15, 17, 18, 20, 21, and 22, assemble certain specified elements in combination in each claim as also forming in such claim a unit of invention in the mechanism. The various elements in all these claims relate to the one principal invention of a "well mechanism." In that relation they are all designed to co-operate in co-operating towards the common end of being employed in an apparatus to be used for drawing clean water from a driven or artesian well. The patent comes within the rule stated by Mr. Justice Story in Wyeth v. Stone, 1 Story, 273, 292, 30 Fed. Cas. page 723, No. 18,107, where it was held that a patent for several machines, each being a distinct and independent invention, is valid where they have a common purpose and are auxiliary to the same common end. It is

not necessary, in order to maintain a suit upon such a patent, says the court, "that there should be a violation of the patent throughout. It is sufficient if any one of the invented machines or improvements is wrongfully used; for that, pro tanto, violates the patent."

To the same effect is Emerson v. Hogg, 2 Blatchf. 1, 8, 8 Fed. Cas. 628, No. 4,440; Hogg v. Emerson, 6 How. 437, 12 L. Ed. 505; Hogg v. Emerson, 11 How. 587, 13 L. Ed. 824.

This rule applies to the invention described in a separate claim as well as to the invention described in the patent as a whole.

The claims charged to have been infringed in this case are 9, 13, and 20 of the combination class. For convenience and accuracy of reference we separate the elements of these claims into clauses, as follows:

Claim 9:
    (1) In a well mechanism
    (2) the combination with a pump casing, of
    (3) a rotary pump, of
    (4) a jointed pump shaft, and
    (5) a closed casing surrounding the pump shaft
    (6) from the pump to the top of the well.
Claim 13:
    (1) The combination with
    (2) a pump and its
    (3) actuating shaft of
    (4) a sectional casing therefor
    (5) provided at each end of each section, with
    (6) a fixed block with
    (7) bearings for the shaft;
    (8) the casing being closed at the top and provided with
    (9) an air vent.
Claim 20:
    (1) The combination of
    (2) a well casing,
    (3) a rotary pump therein, and
    (4) a line shaft for the pump
    (5) entirely closed off from the water in the well.

Referring to the specification and assemblage of the parts of the mechanism in preferred forms illustrated in the drawings accompanying the application for the patent, we find that the "rotary pump" mentioned in clause 3 of claim 9, the "pump" mentioned in clause 2 of claim 13, and the "rotary pump" mentioned in clause 3 of claim 20, have the same identical function, and the approved form of the "pump" used by the inventor is a centrifugal pump. We find also that the "jointed pump shaft" mentioned in clause 4 of claim 9, the "actuating shaft" mentioned in clause 3 of claim 13, and the "line shaft" mentioned in clause 4 of claim 20, perform the same function, the preferred form of which is declared by the specification to be made in sections "which are attached together by means of sliding keys so as to allow of some vertical play with relation to each other."

We find, also, that the combination with a "pump casing" mentioned in clause 2 of claim 9, the "closed casing surrounding the pump shaft" mentioned in clause 5 of claim 9, the "sectional casing" mentioned in clause 4 of claim 13, the "casing being closed at the top" in clause 8 of claim 13, and the "well casing" of clause 2, claim 20, by which the pump is "entirely closed off from the water in the well" mentioned in the last two words of clause 4 and in clause 5 of claim 20, perform the same function, the preferred form of which is declared by the specification to be made in joints of any desired length, with stuffing box at surface of ground at top of pump, so that by the use of the packing boxes an air-tight chamber can be maintained.

In clause 8 of claim 13 "the casing being closed at the top" is followed by the addition in clause 9, "and provided with an air vent," and the "sectional casing" of clause 4 of claim 13 is provided in clause 5 "at each end of each section" with "a fixed block" in clause 6, and with "bearings for the shaft" in clause 7.

This analysis discloses that the essential elements of these three claims consist of (1) a pump, and (2) a pump shaft entirely closed off from the water in the well by (3) a sectional pump casing provided at the end of each section with (4) a fixed block with (5) bearings for the shaft, and (6) the casing being closed at the top and provided with an air vent.

One of the problems for the inventor of this character of pump was to protect the bearings from the sand and water carried up from the well bottom. Another problem was to provide a method for efficiently lubricating the bearings of the pump shaft while it was in operation. No one could descend into the driven well for that purpose, and while oil might be carried to the bearings in small pipes, it was also a problem to keep the used and spent oil from escaping into the water conduit.

To meet these problems the specification describes the closed casing as designed to keep the water out and retain clean fluid for the efficient lubrication of the shaft bearings.

It is contended by the plaintiff that this closed shaft casing has three functions, namely: (1) Protection of the shaft and its bearings from the water and sand pumped to the surface; (2) lubrication of the shaft bearings; and (3) alignment of the shaft.

In the specification we find that one of the functions claimed for this casing is to protect the shaft and its bearings from the water and sand pumped to the surface. Another function claimed is to inclose the means provided for the lubrication of the shaft bearings, but further than this the specification does not go.

In claim 18 the combination includes "a pump and means for suspending it from the top of the well." The plaintiff claims that by this suspension the pump hangs pendent from the top of the well like a plumb bob in the well cavity, and that the shaft casing will also so hang and thus hold in alignment the shaft bearings mounted within the casing, and thereby maintain the shaft in alignment. But we do not find any claim for this suspended structure either in claim 9, 13, or 20; and there is no charge that claim 18 has been infringed.

There is a device mentioned in claim 7 of a combination with a well casing and a pump, a series of wedges suspended by rods from the top of the well for operating the same to wedge the pump casing against the well casing. In claim 8 it is said that these wedges are mounted upon toggle links. It is claimed that this device enters into the mechanism of the shaft casing and has also the function of alignment of the shaft, but there is no charge that either claim 7 or claim 8 has been infringed by the defendant, and it appears from the testimony that this device has been abandoned by the plaintiff and is no longer a part of the mechanism in actual use.

M. E. Layne, the patentee, was a witness for the plaintiff in this case. He was asked on cross-examination if he had ever used the wedges for the function specified in the patent or at all. His answer was: "We have never used the wedges." He was asked concerning the use of the toggles connecting with the wedges, or the parts represented by the rods or links connecting with the toggles, or the rods or links connecting with the wedges, and his reply was that none of them had ever been used. This testimony was given September 2, 1920. The patent was issued to Mr. Layne May 29, 1906.

It seems clear to us that the alignment is not a function of the shaft casing, but is a function of the means used for suspending the apparatus from the top of the well, combined with the law of gravity. This means for suspending the mechanism is to operate on the shaft casing and not the shaft casing upon the means of suspension, and this suspending device for alignment provided for in claim 18 is no part of this controversy. In other words, we are of the opinion that alignment is not a function of any of the elements of either of the claims under consideration.

[2] In Wilson & Willard Mfg. Co. v. Union Tool Co. et al., 249 Fed. 729, 734, 161 C. C. A. 639, 644, this court held:

"That the patentee is limited to his claims, and the patent is no broader than the claims, and, if the language of the claims in the patent is clear and distinct, the patentee is bound by the language he has employed"

—citing Keystone Bridge Co. v. Phœnix Iron Co., 95 U. S. 274, on page 278 (24 L. Ed. 344), where the Supreme Court of the United States say:

"But the courts have no right to enlarge a patent beyond the scope of its claim as allowed by the Patent Office. * * * When the terms of a claim in a patent are clear and distinct (as they always should be), the patentee, in a suit brought upon the patent, is bound by it. Merrill v. Yeomans, 94 U. S. 568. He can claim nothing beyond it. But the defendant may at all times, under proper pleadings, resort to prior use and the general history of the art to assail the validity of a patent or to restrain its construction. The door is then opened to the plaintiff to resort to the same kind of evidence in rebuttal; but he can never go beyond his claim. As patents are procured ex parte, the public is not bound by them, but the patentees are. And the latter cannot show that their invention is broader than the terms of their claim; or, if broader, they must be held to have surrendered the surplus to the public."

We have placed some emphasis upon the fact that all the claims in this patent relate to one principal operative invention of a well mechan-

ism, and in that relation they all in a more or less direct and practical way were designed to co-operate and supplement each other to the common intent and purpose of being employed in an operating pump apparatus for a driven or artesian well; but when we turn to the analysis of the claims in suit, we find that the essential elements claimed to have been infringed are limited and narrow and relate only to combinations of a rotary pump with an actuating shaft entirely closed off from the water in the well by the casing surrounding the pump shaft.

[3] This patent has been before the Circuit Court of Appeals in the Fifth Circuit, on the question of the validity of the patent and the infringement of certain of its claims. In El Campo Mach. Co. v. Layne, 195 Fed. 83, 115 C. C. A. 115, it was held that the patent was valid and claim 13 infringed. In Van Ness v. Layne, 213 Fed. 804, 130 C. C. A. 462, the patent was held valid and claim 20 infringed. In that case the court sustained the claim of the plaintiff that the protecting casing had three functions, namely: (1) To exclude water and detritus from the shaft and its bearings; (2) to provide a means of lubricating the bearings of each section of the shaft from the top of the well without removing the apparatus from it; and (3) to align the bearings and the shaft so as to prevent lateral displacement in the well and keep the shaft in a vertical position. But the court was not very confident that the protective casing as set out in the specification contained novelty enough to constitute invention. The fact, however, that there was for some time an unfilled want for some such apparatus as that disclosed by the patent, in the deep well irrigating industry, persuaded the court that the idea involved invention, though theoretically its novelty and patentability might admit of doubt. With respect to the third function of the shaft casing in aligning the bearings and pump shaft so as to keep the latter in a vertical position in the well, the court was of the opinion that in the absence of intermediate support the tendency of the shaft, if suspended only from the top, would be to swing laterally in the well and so get out of alignment. The court found that this tendency is corrected by taking advantage of the downward pressure of the shaft due to gravity, in connection with the intermediate bearings through which the shaft passes. The court here refers to the bearings for the shaft mentioned in claim 13, but the court found that the defendant's pump in that case infringed the closed pump casing only as to protection and lubrication. With respect to alignment the defendant claimed that his pump was suspended from the top bearing exclusively, and that the lower bearing in his pump performed no function after the casing was fixed in position in the well, and that the intermediate bearings were functionally different from those of the patent in suit. The court appears to have sustained the defendant's contention, for it refused to find that claim 13 had been infringed, finding infringement only with respect to claim 20.

In Getty v. Layne (C. C. A.) 262 Fed. 141, the court followed its decisions in the previous cases, determining the question of the validity of the patent in favor of the plaintiff, but the court held that

the patent was not entitled to the wide range of equivalents of a pioneer patent. With respect to claim 20 and the function of the closed casing, the court held that the defendant's pump in that case could not be held to infringe the means that Layne used to keep the shaft properly aligned, since that was accomplished by suspending the mechanism from the top of the well, while the defendant's pump mechanism received its support by resting on the bottom of the well.

Our conclusion is that the shaft casing has only two functions: (1) To protect the shaft and its bearings from the water and sand pumped to the surface, and (2), to inclose the means provided for lubrication of the shaft bearings. The function of alignment is therefore dismissed from further consideration.

With respect to the shaft casing protecting the shaft from the ingress of water, claim 20 provides that the line shaft shall be entirely closed off from the water. In the specification the inventor declares:

"I consider it of great advantage also to arrange the pump shaft in a closed casing with stuffing box at surface of ground at top of pump, so that by the use of the packing boxes an air-tight chamber can be maintained, and water kept out of the casing, or kept filled with clean liquid, if desired, thereby providing an efficient lubricating system for all bearings of the pump."

There is a pipe or tubular shaft mentioned in the specification which has for one of its purposes a convenient means for forcing the liquid out of the pump shaft casing by forcing air in at the top of the casing. The function of this tubular shaft is further explained by the statement that by forcing air in at the top of the casing by means of a pipe located at that point, the liquid can be forced down into the bottom of the casing, and by means of a small opening at the bottom of the tubular shaft the fluid can be forced out at the top through a pipe outlet and thus keep the casing clear in order to leave the bearings clean therein and not interfere with the working of the pump; or, it is further stated that "this operation may be reversed." This specification clearly calls for an air-tight casing as provided in the other specification previously referred to.

In Getty v. Layne (C. C. A.) 262 Fed. 141, the court, on page 143, in discussing lubrication, referred to the closed casing as causing a stagnation of oil in the bearings. The court said:

"Layne's method of lubrication was to put the oil in at the top and to permit it to descend to each of the bearings, and remain stagnant within the shaft casing until ejected from the top after it had become spent by air pressure through an air vent. When it was ejected, it was replaced by clean oil from the top again. On the other hand, the oil was confined at the bottom of the well by use of a packing or stuffing box. Getty adopted a circulatory system of lubrication. By it the oil was also introduced from the top, and descended to the lower bearings by gravity. However, at the bottom there was only a partial obstruction to its exit, presented by a long sleeve bearing. Its passage out from the shaft casing was automatic and continuous, so that there was a constant and free flow of lubricant from the top of the line shaft, throughout its length, and out through its bottom. This method was claimed to be necessary to Getty's device, because wear on the upper bearing required a continuous supply of fresh oil for its proper lubrication. These functional differences between the stagnant and circulatory systems of lubrication prevent their being considered as merely mechanical equivalents."

The difference between the Layne patent and the Getty mechanism, as it appears in Getty v. Layne, supra, is essentially the difference between the Layne patent and the defendants' mechanism in this case. In the Layne patent the shaft casing is entirely closed,' or that is the invention claimed in claim 20 and is necessarily the operative device of that claim and of claims 9 and 13, and by this device the oil becomes stagnant in the bearings and is blown out when sufficiently used or spent, while the defendants' shaft is not entirely closed but permits the oil to circulate down through the bearings and out at the bottom while the pump is in operation.

We are of the opinion that there is invention in the entirely closed casing of the Layne patent as claimed in claims 9, 13, and 20,. particularly claim 20, functioning as it does in complete protection to the line shaft from the ingress of water and sand and in protecting the means for lubrication.

The next question, is that of infringement. Have the defendants infringed claims 9, 13, and 20 of the plaintiff as thus construed and limited?

The defendants in their answer deny infringement of plaintiff's patent, and allege that the well mechanism charged by the plaintiff as an infringement of the patent in this case was manufactured in accordance with and under the protection of letters patent No. 1,228,770, issued to Stanley M. Halstead, June 5, 1917.

[4] In Ransome v. Hyatt, 69 Fed. 148, 16 C. C. A. 185, this court held that the issuance of a later patent was prima facie a presumption of a patentable difference between it and an earlier patent, following the decisions of the Supreme Court in Miller v. Eagle Mfg. Co., 151 U. S. 186, 208, 14 Sup. Ct. 310, 38 L. Ed. 121; Boyd v. Janesville Hay Tool Co., 158 U. S. 260, 261, 15 Sup. Ct. 837, 39 L. Ed. 973. It is also a rule of law that infringement being denied, the burden of proof is upon the plaintiff to establish the charge. Fuller v. Yentzger, 94 U. S. 299, 305, 24 L. Ed. 107; Bates v. Coe, 98 U. S. 31, 49, 25 L. Ed. 68. We start, then, with a presumption in favor of the defendants' apparatus under the Halstead patent, and against the alleged infringement, and the burden of proof upon the plaintiff to establish infringement.

The plaintiff contends that there is no substantial difference between the two mechanisms; that defendants' mechanism, as installed, accomplishes the same result as the plaintiff's by substantially the same means, operating in substantially the same way. The court below was of that opinion. The controversy requires a careful examination of the defendants' apparatus in performing the function of protection to the shaft and in the lubrication of the bearings.

In the application for the Halstead patent the inventor stated that one of the objects of the invention was to keep the bearings of the pump shaft properly lubricated. The means for such lubrication is set forth in the specification. It will be seen that the means involves also the method of protection, or lack of protection, to the shaft bearings. The specification is as follows:

"When these parts are properly assembled and fitted, * * * I am enabled to lubricate all of the bearings with a very small amount of oil in an emulsified form. * * * Conduits * * * do not fit tightly into their respective rabbets, but effect a loose sliding fit, thereby permitting a small amount of water to work its way through into the interior of said conduits at these points, the water thus entering being practically free of sand or grit of any kind because of the filtering action of the small space through which it makes its way. This provision for a small quantity of water in the conduits is made so that when oil is fed into the top bearing * * * and makes its way through said bearing down the shaft to the second bearing, * * * it mixes with the water at said bearing and is emulsified by the rotary action of the shaft. * * * This emulsion passes down through the successive bearings until the bottom bearing * * * is reached, where it passes out through channel * * * and auxiliary conduits into the well proper. * * *

"It is, of course, well known that clear water is an excellent lubricant, but the tendency of the shaft to corrode renders its use objectionable when used alone. The use of oil alone is highly objectionable as it contaminates the water to such a degree as to become a nuisance when fed from the top or bottom, and requires a more or less complicated system of pipes when fed directly to each bearing, besides adding considerably to the expense of operating. I obviate these objectionable features by using an oil emulsion as a lubricant as above described, thereby providing a cheap lubricating medium, preventing corrosion of the shaft, not contaminating the water delivered and, on account of the constant flow of water through the bearings, providing an efficient cooling system for said bearings."

We have not had the opportunity of seeing the plaintiff's pump at work, nor that of the defendants; but we have carefully examined and analyzed the specifications and claims of both patents and have endeavored to understand their mechanisms and the methods of their operation, by the aid of the expert testimony. The fact remains, however, that we must depend largely upon the facts as related by the witnesses concerning the actual working of these pumps.

E. P. Lesley, a professor of mechanical engineering at Stanford University, was called as a witness for the defendants at the trial. He testified that he had been familiar with the defendants' pump for about two years. In the past year he had been retained by them in an advisory capacity and he had watched operations in their shop; had examined their pump and had superintended the installation of one pump at Stanford University; had tested the pumps manufactured by the Western Well Works, making observations of the various component parts. Referring to the model of the pump in evidence, he identified it as representing substantially the Halstead patent. He explained the operation of the model as follows:

"In operation, this pump is driven from the top, either by a belt connection or a direct-connecting motor, and the runner is rotated; the centrifugal action of the runner drives the water out in the passage of the discharge column, and it is delivered at the surface of the ground, or above the surface, as may be desired. The particular feature of this pump which may need further explanation is the lubricating system. The top, what has been called the top tube bearing No. 11, is provided with holes that are adapted to receive an oil pipe, to which is attached a drip feed oil cup. Oil is fed into a small receptacle, which is channeled in the upper end of the tube bearing member, No. 11, and as the shaft is rotated it is fed and moved by gravity down the shaft-inclosing casing, No. 8, until it reaches a point near the top of the pump, where it may meet, or where it meets a recess that is cored in

the part No. 17, in the bearing part of No. 17; here are provided two drain pipes; these are made in this side installation of quarter-inch pipe that is inserted in the mold before casting. These drainpipes are open to the well without the discharge casing, so that lubricant fed and moving by gravity, or fed by other means down the shaft-inclosing casing, runs out into the well at this point."

The witness was asked if he had made any tests to satisfy himself that the mode of operation he had described was correct. He replied that he had made a number of tests as to the operation of the defendants' pump with respect to lubrication. The tests were made after the commencement of the suit. One of the tests was of a pump installed by the defendant the Western Well Works Corporation, at the farm of E. W. Connant near San Jose, Cal. The evidence was introduced for the purpose of showing that there was a leakage of water through the line joints of the conduit or shaft casing as stated in the specification of the Halstead patent. It would not be practicable to refer to these tests in detail. They were not satisfactory to the court below and were not accepted for the purpose of drawing inferences therefrom as the opinion of an expert, but it was held that such inferences would be drawn by the court. The evidence did, however, tend to prove that some water passed through the conduit or shaft casing at the tube joints to the interior shaft. But there was testimony, on the other hand, tending to show that the connections of the shaft casing were so shaped as to be made tight, and that white lead was used on the joints and hard grease introduced into the interior of the casing so that no water of any amount could pass into the interior of the shaft casing. We think the preponderance of the testimony tended to establish that fact, and we concur with the court below upon that question; but the controlling question still remains to be determined. Does the lubricating oil introduced into the defendants' shaft casing pass down through the bearings, and after being used and spent, finally pass out at the bottom of the shaft into the well proper through a channel or auxiliary conduit constructed for that purpose? If it does, then it is not the same mechanical device for lubrication claimed and specified in the plaintiff's patent. The plaintiff's device does not have any outlet for the used and spent oil to pass out into the well, and as we understand the mechanical construction of plaintiff's pump, it was devised, in part at least, for the specific purpose of avoiding that objection.

That this objection was deemed serious at that time appears from the testimony relating to the Byron Jackson pump set up in the defendants' answer as an anticipation of the Layne mechanism. We did not discuss that feature of the case when we were considering the elements of the Layne patent, for the reason that while the Jackson pump appeared to be earlier in its conception in point of time, we did not deem it an anticipation in the element of the line shaft for the pump being entirely closed off from the water in the well, as claimed in claim 20 of the Layne patent. The testimony relating to this feature of the Jackson pump mechanism is found in the testimony of Daniel W. Mead, a graduate of Cornell University, a civil engineer by profession, and a professor of hydraulic and sanitary engineering at

the University of Wisconsin. He was employed to develop the water supply for the city of Rockford, Ill. In that connection he came to San Francisco to interview various manufacturers of centrifugal pumping machines and met, among others, Byron Jackson of the Byron Jackson Machinery Company, who was engaged in the manufacture of centrifugal pumps. With a representative of that company Prof. Mead visited pumping plants in the Sacramento Valley and in San Jose, Cal. He entered into a contract for the furnishing of three pumps for the city of Rockford, Ill., to be operated 85 feet below the surface in a shaft 15 feet in diameter. The pumps were furnished and worked successfully. He was employed to develop a great many deep wells, which he did, using the Byron Jackson centrifugal pump, in bored wells of from 8 to 15 inches in diameter. Among others, one for the Pabst Brewing Company at Milwaukee, Wis. This pump was installed in 1903, and raised the water about 200 feet in a bored well 15 inches in diameter. The correspondence between Prof. Mead and Byron Jackson Machine Works relating to this pump for the Pabst Brewing Company is in the record, from which it appears that Jackson was asked for the designs for a centrifugal pump for a well of the specified dimensions. Jackson replied under date of February 17, 1902, that he could design a pump for a 16-inch well to be placed 150 feet below the surface, to discharge directly into the center of the shaft running through the pipes, thus to be coupled up and hung in the well by the pipe, having no other framework. "But the difficulty in this problem," he said, "is oiling the shafting and friction of couplings in water." After some correspondence Prof. Mead came to San Francisco and saw Mr. Jackson upon the subject of pumps and their construction.

In the correspondence and discussion that followed between Mead and Jackson, the witness said that he, himself, did not appreciate the necessity of an inner pipe and raised the objection that it added to the expense and inquired why it was used. Jackson called the attention of the witness to the fact that in deep wells frequently more or less sand is discharged and that the sand coming up in the water is apt to get in the bearings and destroy them. Another point he made was that water lubrication was not satisfactory and that the bearings should be lubricated with oil; that the bearings of the shaft were to be located inside the central pipe so that they could receive oil from the surface and be free from the action of either standing water or water discharged by the pump, and the bearing plates were also to act as a separator between the outer pipe and the inner pipe, and to give together with the pipes a continuous connection from the drive head above to the pumps below.

Under date of April 20, 1903, the Pabst Brewing Company submitted to Byron Jackson the form of agreement for the construction of a centrifugal pump for a 15-inch well 200 feet deep, to be delivered within 60 days. The agreement contains specifications for the pump, among others:

"Bearings approximately every ten (10) feet and suitable means for providing for oiling the same, which will allow no mixture of oil and water."

Under date of April 29, 1903, Jackson wrote to Prof. Mead, in Chicago, as follows:

"It is true that this design of a pump does not take very much material or work after it is once developed, but at present no such pump has been developed and I want to get a price that will help to pay for the developing, and now that I have the order for the Pabst Brewing Company, I propose to make this pump and test it anyway, whether it is ever shipped and installed or not."

In a letter dated May 22, 1903, Jackson refused to sign the contract for the pump, containing a clause providing that there should be no discharge into the well of a mixture of oil and water. He states his objection to that part of the contract as follows:

"In your contract under heading of 'Pump' in the line next to the last on the first page, reading as follows: 'Which will allow no mixture of the oil and water,' I think this is an impossibility to make such a design, besides my blueprints are very clear and show that the excess of oil after passing through all the bearings on the line shaft will discharge into the well, and I specially mention this in some of my correspondence with Mr. Mead. This objection, however, is a common one and was made at Rockford and many other places where we put in city water works pumps, but after years of use, the amount of oil passing into the water has not proved a serious item; but if it is a serious item in your case, I do not know how to remedy it and for this reason, if no other, I would have to decline your contract."

Under date of June 9, 1903, Mr. Jackson again wrote to Prof. Mead that he would have to decline the Pabst contract, saying:

"I certainly was surprised that they should put in the contract that we would guarantee not to get any oil in the water, as that was impossible."

Again, under date of June 30, 1903, Jackson wrote to Prof. Mead, declining the contract, as follows:

"Now, I shall have to decline to sign this part of the contract, because the undue quantity will all depend upon the amount of oil supplied to the oilers and the use for which the water may be intended, because I know of no method of retaining the oil in the bearings and all of the waste oil is there to pass into the water pumped."

In a letter dated September 5, 1903, Mr. Jackson still objects to the proposed contract, saying:

"You will note that I make no guaranty regarding oil injuring the water or making it in any way unsuitable for the use of the Pabst Brewing Company. * * * There may be instances where the oil would accumulate on top of the water and be seen and commented on. If the oil is detrimental it is barely possible that some kinds of oil may be less detrimental than others; for instance, sweet oil, cotton seed oil, or even castor oil, might be good for the health."

The pump was finally accepted by the Pabst Brewing Company without the clause in the contract providing that there should be no discharge of oil into the water in the well.

The Layne application for a patent was filed in the Patent Office April 28, 1903. The dominant element in that invention was the claim for a line shaft for the pump entirely closed off from the water in the well. On the day following, that is to say, on April 29, 1903, Byron Jackson, an experienced and well-known manufacturer of centrifugal pumps, who had developed substantially all the other essential ele-

ments of the Layne improvement but that that one element, declared that a pump with that element in it had not been developed (not then knowing, of course, of the application for the Layne patent), and on May 23, 1903, he declared that it was impossible to make a pump that would not allow a mixture of oil in the water, and on that account he declined to make the contract with the Pabst Company. This refusal to make a contract, with the provision not to allow a mixture of oil and water in the well, he repeated until it was waived by the Pabst Company and a pump accepted without it.

We think this evidence establishes very clearly that the Jackson mechanism was not an anticipation of that dominant feature of the Layne invention. The defendants' pump is substantially the Jackson mechanism with respect to the discharge of used or spent oil from the bottom shaft into the water of the well, and is therefore not an infringement of plaintiff's patent for an entirely closed casing for the line shaft.

The decree of the court below is reversed, with directions to dismiss the bill, with costs to the defendants.

GILBERT, Circuit Judge (dissenting). I submit that the question of infringement in this case is not determinable upon the mechanism described in the Halstead patent. It is determinable upon the mechanism which was actually used by the appellants at the time of the institution of the suit. The court below found, and it is so shown by the evidence, that while at the outset the appellants may have undertaken to follow the Halstead patent, they had abandoned it at the time when the suit was commenced, and were using great care so to construct their mechanism as to make a perfect union between casing and coupling with the complete exclusion of water; that the joints of their structure were sealed with white lead, and for a considerable distance the space between the driving shaft and the walls of the casing was packed with hard grease. There can be no doubt that the appellee's invention did, as was said in the case of Getty v. Layne (C. C. A.) 262 Fed. 141, "accomplish a revolution in the well-drilling industry." And while the invention may not be said to be of a pioneer character, it is, nevertheless, an invention of such merit as to be entitled to protection against a reasonable range of mechanical equivalents. In both the appellee's and appellants' mechanisms the oil is introduced at the top in substantially the same manner, and by gravity it traverses the entire length of the shaft, thereby lubricating all the bearings. In both there is some escape of oil through the lowest bearing. The contention that the two systems are differentiated in that the appellee's lubricating system is static, while that of the appellants' is circulatory, is not sustained by the proofs. In the appellants' mechanism, the shaft casing being made impervious to water and packed with hard cup grease a distance above and below each bearing, the ingress of water is prevented, and the movement of the lubricating oil is impeded, so that there is no substantial difference in the operation of the two lubricating systems. Both use a closed casing surrounding the pump shaft from the pump to the top of the well, the

casing being sufficiently closed to allow the feeding of a lubricating fluid down through the same to the various bearing parts for the shaft therein. Both accomplish the same result by substantially the same means, operated in substantially the same way. The fact that the appellants' static lubricants are supplemented by the use of an emulsifying oil is unimportant. The fact that in the appellants' mechanism more oil escapes from the lowest bearing than in the appellee's is also unimportant. The ultimate disposition of the lubricant after its office is fulfilled is immaterial. These differences do not enable the appellants to appropriate the substance of the appellee's invention.

In brief, the evidence shows that the appellants, as does the appellee, use a deep well pump mechanism assembled unit by unit, and lowered into the well bore so as to hang from the surface, the mechanism consisting of: (1) A pump impeller attached to a sectional power shaft extending from the pump to the top of the well, and inclosed in a casing; (2) a water discharge sectional casing extending from the pump casing to the top of the well; (3) a sectional casing extending from the pump casing to the top of the well, provided at the end of each section with a fixed block, with bearings for the shaft closed at the top, the casing being adapted to hold the power shaft in alignment by means of the bearings to protect the power shaft and its bearings from injurious action of sand or soil in the water, and to form a means for conducting lubricant from the top down through each shaft bearing.

I think that the decree of the court below should be affirmed.